№ 16-CV-5601 (JFB)

BRIAN E. BRISKA,

Plaintiff,

VERSUS

NANCY A. BERRYHILL,
ACTING COMMISSIONER OF SOCIAL SECURITY,

Defendant.

**MEMORANDUM AND ORDER**
May 10, 2018

JOSEPH F. BIANCO, District Judge:

Plaintiff Brian E. Briska brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability benefits.[1] Administrative Law Judge Jacqueline Haber Lamkay ("the ALJ") determined that plaintiff had the residual functional capacity ("RFC") to perform sedentary work, with certain limitations; that there were jobs in the national economy that plaintiff could perform; and that, therefore, plaintiff was not disabled. The Appeals Council denied plaintiff's request for review of the ALJ's determination. Accordingly, the ALJ's determination became the Commissioner's final determination.

Plaintiff now moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Plaintiff argues that (1) the ALJ did not accord adequate weight to the medical opinions of plaintiff's treating physician; (2) the ALJ's RFC assessment was not supported by substantial evidence; and (3) the ALJ failed to properly evaluate plaintiff's credibility. Plaintiff requests that the Commissioner's decision be reversed and that the Court remand the case with instructions to award benefits.

---

[1] Plaintiff brought this action against Carolyn W. Colvin, who was then the Acting Commissioner of Social Security. Nancy A. Berryhill now occupies that position.

Alternatively, plaintiff requests that the Commissioner's decision be reversed and that the Court remand the case for a new hearing. The Commissioner opposes plaintiff's motion and cross-moves for judgment on the pleadings.

For the reasons set forth below, the Court denies plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion for judgment on the pleadings, and remands the case to the ALJ for further proceedings consistent with this Memorandum and Order.

## I. FACTUAL BACKGROUND

The following summary of the relevant facts is based on the Administrative Record. (ECF No. 8.)

### A. Personal and Work History

Plaintiff was born on July 2, 1967. (AR at 28-29.) He is a high school graduate, with some college education. (AR at 31.) Plaintiff is approximately six feet tall and weighs 235 pounds. (AR at 28-29.) He is married, and has one daughter and one son. (AR at 29.)

Before the onset of his alleged disability on June 19, 2012, plaintiff worked for the Suffolk County Police Department ("SCPD") for approximately 18 years. (AR at 32, 37.) From 1994 until 2005, plaintiff was an SCPD patrol officer, and his duties involved answering phones, taking complaints, making arrests, and responding to car accidents. (AR at 38.) From 2005 until 2012, plaintiff was assigned to the Selective Alcohol Fatality Enforcement Team, tasked with, among other things, apprehending intoxicated drivers. (*Id.*)

Plaintiff suffered numerous serious injuries during his 18 years working for the SCPD. In 1998, plaintiff was in a motor vehicle accident while on duty, which resulted in cervical herniated discs in his spine. (AR at 217.) Plaintiff suffered further cervical spine injuries in another on-duty motor vehicle accident in 2001. (*Id.*) In 2008, plaintiff was hit by a truck and sustained severe injuries to both hips. (AR at 231.) In 2010, plaintiff was in another motor vehicle accident. (AR at 217.) Also in 2010, plaintiff slipped and fell while on duty, injuring his right knee. (*Id.*)

Plaintiff allegedly became disabled on June 19, 2012. On September 17, 2014, plaintiff attempted to go back to work on light duty, but was sent home the same day "after about seven hours because [he] was in too much pain." (AR at 33.) According to plaintiff, he was unable to get out of bed the next day, and opted to take a sick day rather than "go to reoccurrence" on his injuries. (AR at 34.) The following day, plaintiff went to work, but "halfway through the day [he] couldn't deal with it and [he] went to reoccurrence." (*Id.*) Plaintiff retired on October 31, 2014. (*Id.*)

### B. Relevant Medical History

#### 1. Medical Evidence before June 19, 2012

On March 1, 2010, a magnetic resonance imaging scan ("MRI") of plaintiff's right knee showed: a "[m]ild linear signal abnormality through the outer third of the body of medial meniscus contacting the inferior articular surface consistent with the presence of a small horizontal tear"; "joint effusion"; a "delaminating tear through the median patellar cartilage"; and a "[p]opliteal cyst with adjacent fluid indicating leakage/rupture". (AR at 247.)

Following surgery on his right knee, an October 9, 2010 MRI showed the patellar chondral fissure was of stable appearance; the lateral meniscus was intact; there was abnormal signal in the body remnant; and there was a small joint effusion. (AR at

2

244-45.) There was no evidence of an additional tear. (AR at 244.)

On February 9, 2011, plaintiff saw Andrea Coladner, D.O., for tingling in his left wrist. (AR at 320-21.) In her examination report, Dr. Coladner noted that plaintiff exhibited a somewhat reduced range of motion, with pain in his left elbow and wrist, as well as muscle weakness in his left tricep and hand. (AR at 320.) Dr. Coladner concluded that plaintiff had a 10 to 12.5 percent reduction in left wrist motion and a 7.5 to 10 percent reduction in left elbow movement. (AR at 321.) Dr. Coladner diagnosed left ulnar tendonitis and left tricep laceration. (*Id.*) Dr. Coladner noted that plaintiff was performing his usual work activities. (*Id.*) For Workers' Compensation, Dr. Coladner assessed a 30 percent loss of use of the left wrist. (AR at 322.)

On February 16, 2011, Stephen O'Brien, M.D. performed an arthroscopy and partial menisectomy on plaintiff's right knee. (AR at 241-42.) Dr. O'Brien's post-operative diagnoses included plica syndrome, a tear in plaintiff's medial meniscus, and a degenerative tear in plaintiff's lateral meniscus. (AR at 241.)

2. Medical Evidence after June 19, 2012

On June 20, 2012, plaintiff went to the emergency room at St. Charles Hospital in Port Jefferson, New York for lower back pain radiating down his leg. (AR at 190-91.) The hospital records reflect that plaintiff rated the pain at an eight out of ten. (AR at 190.) The records further reflect that plaintiff's straight leg raise was negative and that his reflexes, motor, and sensation were normal. (*Id.*) Plaintiff was diagnosed with low back pain strain and was prescribed Flexeril, Naproxyn, and warm compresses. (AR at 191.)

Shortly thereafter, on June 27, 2012, plaintiff visited a physiatrist, Barry Rubin, M.D., for lower back pain radiating down his leg and pain in his left hip. (AR at 217-23.) The examination report reflects that plaintiff was experiencing acute lower back pain. (AR at 217.) Dr. Rubin noted that plaintiff walked with an antalgic gait favoring the left leg; plaintiff's lumbar spine had a limited range of motion, with pain; plaintiff's straight leg raises were positive; plaintiff's left hip had a limited range of motion, with pain; sensation was reduced in plaintiff's left leg; and plaintiff could walk on his heels and toes. (AR at 218-19.) Dr. Rubin further noted that "[o]n palpation, there was tenderness involving the L4/L5 and L5/S1 interspaces, tenderness involving the bilateral sacroiliac joints, trigger points involving the bilateral gluteal musculature with greater involvement on the left, and spasm involving the bilateral lower lumbar paraspinal musculature." (AR at 218.) Dr. Rubin diagnosed plaintiff with acute lumbosacral spine strain with sacroiliac joint derangement; lumbar radiculitis; lumbar and gluteal muscle spasm; left ilioinguinal ligament sprain; and left hip sprain with possible internal derangement. (*Id.*) Dr. Rubin recommended physical therapy, ordered lumbar spine and hip x-rays, and prescribed Mobic, Flexeril, and Ultram. (AR at 219.)

Plaintiff visited Dr. Rubin's office for physical therapy on June 28, July 2, July 3, July 6, July 9, and July 11, 2012. (AR at 259-60.)

A July 11, 2012 MRI of plaintiff's left hip showed "bilateral hip avascular necrosis"; "sclerosis on the superior aspect of the left femoral head consistent with injury to the subchondral trabecula"; "minimal flattening of the left femoral head"; "bone marrow edema in the left femoral neck"; and "left hip joint effusion". (AR at 248.)

3

A July 13, 2012 MRI of plaintiff's lumbar spine revealed "minimal non-compressive disc bulges at the L4-L5 and L5-S1 levels." (AR at 250.) The MRI also showed that the disc bulges were not "contributing to central spinal canal stenosis, lateral recess stenosis, or direct nerve root compression" and that "[t]here [wa]s no significant facet arthropathy." (*Id.*)

Plaintiff continued physical therapy at Dr. Rubin's offices on July 13, July 16, July 17, July 18, August 1, August 3, August 13, August 15, August 20, August 22, and August 23, 2012. (AR at 260-62.)

On November 14, 2012, plaintiff visited Brett Silverman, D.O. for continued right knee pain. (AR at 254-55.) Dr. Silverman's examination report reflects that, despite two surgeries to his right knee and several cortisone injections, plaintiff still had pain and swelling in his right knee. (AR at 254.) Dr. Silverman reported that plaintiff's right knee exhibited mild diffuse swelling, a somewhat limited range of motion, and "significant crepitus with passive and active range of motion." (AR at 255.) However, Dr. Silverman also concluded that there was "no increased warmth, erythema, bruising, or echymosis" and "no gross instability with varus/vulgus stress; and no acute distress." (*Id.*) On examination, plaintiff walked with a "mild antalgic gait," but could transfer on and off the examination table independently. (*Id.*) An x-ray of plaintiff's right knee showed no fracture or dislocation. (*Id.*) Dr. Silverman recommended home exercises and prescribed Lidoderm patches. (*Id.*) He opined that plaintiff's right knee would not prevent plaintiff from working. (*Id.*)

On November 28, 2012, Dr. Rubin examined plaintiff. (AR at 280.) Dr. Rubin noted that plaintiff continued to complain about increasing and persistent lumbar pain, which was causing difficulty sleeping. (*Id.*) Dr. Rubin observed lumbosacral spasm and an impaired range of movement. (*Id.*)

On December 4, 2012, plaintiff visited Douglas Padgett, M.D. of the Hospital for Special Surgery for "severe increasing pain" in his left hip. (AR at 192-93.) Dr. Padgett's examination report notes that plaintiff walked with a stiff antalgic left hip gait; that his cervical spine, upper extremities, and lumbar spine were largely unremarkable; that straight leg raises caused pain in his left hip; and that plaintiff's range of motion was limited and caused pain. (AR at 192.) Dr. Padgett further noted that an x-ray showed "osteonecrosis and collapse involving the left femoral head with secondary degenerative changes" and that plaintiff "might have some early osteonecrosis of the right hip, but at th[at] point there [wa]s no evidence of collapse." (*Id.*) Dr. Padgett noted that plaintiff's right hip was not causing him pain at that point in time. (*Id.*) Accordingly, Dr. Padgett recommended a total left hip replacement. (AR at 193.)

Plaintiff visited Dr. Rubin's offices for physical therapy on December 5, December 6, December 7, and December 12, 2012. (AR at 262-63.)

On December 12, 2012, plaintiff returned to Dr. Silverman for a follow-up appointment regarding his right knee. (AR at 252-53.) Dr. Silverman noted that plaintiff was still experiencing chronic swelling and pain in his right knee, but that Lidoderm patches helped to alleviate the pain. (AR at 252.) Dr. Silverman concluded that plaintiff had a 30 percent loss of use of the right leg; that plaintiff's right knee had reached maximum medical improvement; and that plaintiff might eventually require an arthroplasty. (AR at 253.) Dr. Silverman reported to Workers' Compensation that he had diagnosed plaintiff with internal knee derangement and rated his impairment to his right leg at 30

4

percent. (AR at 323-24.)

Plaintiff returned to Dr. Rubin's offices for physical therapy on December 13, December 14, December 17, December 19, December 26, and December 27, 2012. (AR at 263-64.)

On January 2, 2013, after examining plaintiff, Dr. Rubin noted impaired range of motion in the lumbar spine, lumbar spasms, and paresthesia. (AR at 281.)

On February 6, 2013, Dr. Padgett performed a total left hip replacement surgery on plaintiff. (AR at 204-05.)

On February 28, 2013, plaintiff had another appointment with Dr. Rubin. (AR at 281.) Dr. Rubin's notes reflect that plaintiff had pain in his lower back and left hip, and that plaintiff was using a cane to walk. (*Id.*)

Plaintiff returned to Dr. Rubin's office for physical therapy on March 5, March 8, March 12, March 18, March 21, April 2, April 9, April 11, April 16, April 18, 2013. (AR at 265-66.)

On April 22, 2013, Dr. Rubin examined plaintiff. (AR at 282.) Dr. Rubin's examination notes from plaintiff's April 22 visit are difficult to decipher.[2] Those notes that are legible indicate that plaintiff's gait was improving and that Dr. Rubin observed a spasm in plaintiff's left gluteal muscle. (*Id.*) The notes also appear to indicate that plaintiff was taking oxycodone. (*Id.*)

Plaintiff went to Dr. Rubin's offices for physical therapy on May 7, May 9, May 14, May 16, and May 21, 2013. (AR at 266-67.)

On May 22, 2013, Dr. Rubin examined plaintiff again. (AR at 282.) These notes are also difficult to decipher, but appear to indicate that the spasm in plaintiff's left gluteal muscle was improving. (*Id.*)

Plaintiff visited Dr. Rubin's office for physical therapy on May 28, May 30, June 4, June 6, June 11, June 13, and June 20, 2013. (AR at 268-69.)

On June 24, 2013, plaintiff had an appointment with Dr. Rubin. (AR at 283.) Dr. Rubin noted improvement in plaintiff's left hip, but also that plaintiff continued to have pain in his lower back. (*Id.*) In examining plaintiff, Dr. Rubin noted that plaintiff's straight leg raises were positive at 40 degrees on the right and 50 degrees on the left, with spasms in the bilateral paraspinals and impaired range of motion in the lumbar spine. (*Id.*)

Plaintiff returned to Dr. Rubin's office for physical therapy on June 26 and June 27, 2013. (AR at 269.)

Dr. Rubin next examined plaintiff on August 20, 2013. (AR at 283.) Dr. Rubin noted improvement in plaintiff's left hip, but that plaintiff continued to suffer from lower back pain. (*Id.*) He observed spasms in plaintiff's lower back and impaired range of motion in plaintiff's lumbar spine, with flexion limited to 52 degrees, extension to 18 degrees, and lateral bending to 30 degrees on the right and 25 degrees on the left. (*Id.*)

Plaintiff returned to Dr. Rubin's offices for physical therapy on September 4, September 5, September 10, and September 12, 2013. (AR at 269-70.)

On September 18, 2013, after examining plaintiff, Dr. Rubin again noted improvement in plaintiff's hip, but also noted lumbar spasms, impaired range of motion in the lumbar spine, and continued lower back pain. (AR at 284.)

---

[2] The Court notes that significant portions of Dr. Rubin's examination notes are difficult to read, and reminds the ALJ that she may request clarification and/or supplementation from Dr. Rubin on remand.

5

On September 19, 2013, plaintiff visited Dr. Padgett for a six-month post-operative examination of his left hip. (AR at 313.) Dr. Padgett found that plaintiff's left hip replacement was healing well, but that plaintiff had osteonecrosis in his right hip. (*Id.*) An x-ray taken the same day showed "mild joint space narrowing in the right hip with, of greater note, increased density in the femoral head consistent with avascular necrosis." (AR at 317.)

Plaintiff continued physical therapy at Dr. Rubin's offices on September 19, September 24, October 1, October 3, October 8, October 10, October 14, and October 16, 2013. (AR at 271-72.)

On October 23, 2013, after examining plaintiff, Dr. Rubin observed positive straight leg raises on the right at 50 degrees and on the left at 40 degrees. (AR at 284.) Dr. Rubin also found significantly impaired range of motion in the lumbar spine. (*Id.*)

On November 5, 2013, an MRI of plaintiff's lumbar spine revealed a "stable small left foraminal disc protrusion without nerve root compression" at L4-5; a "stable mild disc bulge eccentric to the left minimally narrowing the left neural formen without nerve root compression" at L3-4; and a "stable small right central disc protrusion without spinal canal stenosis or nerve root compression" at T12-L1. (AR at 251.) Dr. Rubin's impression from the MRI was "[s]table mild degenerative changes without significant spinal canal stenosis or nerve root compression." (*Id.*)

Plaintiff continued physical therapy at Dr. Rubin's offices on November 19, November 21, and November 25, 2013. (AR at 272.)

On December 3, 2013, after examining plaintiff, Dr. Rubin noted ongoing lumbar pain, right hip pain, impaired range of motion in the lumbar spine, and lumbar muscle spasms. (AR at 285.) The examination notes appear to indicate that Dr. Rubin prescribed Percocet for plaintiff's pain. (*Id.*)

Plaintiff received physical therapy at Dr. Rubin's offices on December 5, December 12, December 19, December 24, December 30, and December 31, 2013. (AR at 272-73.)

Dr. Rubin examined plaintiff on January 15, 2014. (AR at 285.) His examination notes indicate that plaintiff continued to experience pain, spasms, and limited range of motion in his lumbar spine, with flexion limited to 58 degrees, extension to 15 degrees, and lateral bending to 34 degrees on the right and 30 degrees on the left. (*Id.*) Dr. Rubin also noted increasing pain in plaintiff's right hip. (*Id.*)

On February 6, 2014, plaintiff visited Dr. Padgett for a one-year post-operative examination of his left hip. (AR at 312.) Dr. Padgett noted that plaintiff was "[d]oing well, minimal pain"; that plaintiff was "walking with a nice gait"; that plaintiff had "[n]o pain with leg raising"; and that plaintiff had "excellent mobility involving his left hip." (*Id.*) Dr. Padgett also noted, however, that plaintiff "does have osteonecrosis on the right," but "not to the point where he needs to consider getting the [right] hip replaced." (*Id.*) Dr. Padgett additionally noted that plaintiff was experiencing increasing pain in his lower back. (*Id.*) An x-ray taken the same day showed osteonecrosis in plaintiff's right hip, "without subchondral fracture or collapse." (AR at 316.)

Plaintiff visited Dr. Rubin again on February 18, 2014. (AR at 286.) Dr. Rubin again noted right hip and lower back pain, with lumbar spasms and significantly impaired range of motion, with flexion limited to 55 degrees, extension to 15

6

degrees, and lateral bending to 33 degrees on the right and 30 degrees on the left. (*Id.*) The notes also appear to indicate that Dr. Rubin prescribed Percocet for plaintiff's pain. (*Id.*)

Dr. Rubin noted similar findings after examining plaintiff on March 18, 2014. (*Id.*) Specifically, he noted "persistent, worsening low back pain," spasms, and a significantly limited range of motion, with flexion at 50 degrees, extension at 12 degrees and lateral bending at 28 degrees on the right and 25 degrees on the left. (*Id.*) Dr. Rubin again included Percocet in his treatment plan. (*Id.*)

On April 23, 2014, after examining plaintiff, Dr. Rubin again noted hip pain and "persistent low back pain," lower back spasms, and a significantly limited range of motion in the lumbar spine. (AR at 287.)

Plaintiff received physical therapy at Dr. Rubin's offices on May 28, May 30, June 3, and June 5, 2014. (AR at 274.)

On June 10, 2014, after examining plaintiff, Dr. Rubin noted that physical therapy had been beneficial, but that plaintiff continued to experience right hip pain, low back pain, muscle spasms, and a significantly impaired range of motion with flexion at 55 degrees, extension at 12 degrees and lateral bending at 27 degrees on the right and 24 degrees on the left. (AR at 287.) Dr. Rubin's treatment plan again included Percocet. (*Id.*)

Plaintiff received physical therapy at Dr. Rubin's offices on June 10, June 12, June 13, June 17, June 19, June 24, and July 1, 2014. (AR at 274-75.)

On July 22, 2014, Dr. Rubin reported continuing pain in plaintiff's right hip and lower back. (AR at 288.) He also noted lumbar muscle spasms and impaired range of motion in the lumbar spine, with flexion to 58 degrees, extension to 15 degrees, and lateral bending to 30 degrees on the right and 33 degrees on the left. (*Id.*)

On August 7, 2014, plaintiff visited Dr. Padgett for an 18-month post-operative examination of his left hip. (AR at 311.) Dr. Padgett noted that plaintiff was "doing well," but that plaintiff's recovery was "somewhat slow" because of "how disabled he was preoperatively coupled with some back-related issues." (*Id.*) Dr. Padgett's report indicates that plaintiff's back was "making some improvement." (*Id.*) Dr. Padgett also noted that plaintiff had necrosis in his right hip and that plaintiff rated the pain at a five out of ten. (*Id.*) Dr. Padgett's treatment plan notes state that "[t]he right hip, at this point, is obviously affected with the osteonecrosis," but given that plaintiff was still "extremely functional," Dr. Padgett was "somewhat reluctant to recommend going forward with a hip replacement until it has reached the point where it is quite disabling." (*Id.*) An x-ray taken the same day did not reveal any significant changes to plaintiff's right hip since the February 6, 2014 x-ray. (*Id.*)

On August 26, 2014, Dr. Rubin completed a doctor's progress report for the Workers' Compensation Board. (AR at 338-39.) Dr. Rubin diagnosed hip sprain/strain, lumbar sprain/strain, and lumbar radiculopathy. (*Id.*) Dr. Rubin noted that he had observed lower back pain, intermittent left hip pain, and increased right hip pain in plaintiff. (AR at 338.) Dr. Rubin opined that plaintiff's level of temporary impairment was 100 percent. (AR at 339.)

In late October 2014, Dr. Rubin completed a Medical Source Statement. (AR at 340-45.) Dr. Rubin's statement indicated that plaintiff could occasionally lift five to twenty pounds, but that plaintiff could never life more than twenty pounds.

7

(AR at 340.) Dr. Rubin found that plaintiff could occasionally carry five to ten pounds, but could never carry more than ten pounds. (*Id.*) Dr. Rubin noted that plaintiff could sit, stand, and walk for less than one hour at a time; that he could sit for a total of three hours during an eight hour work day; that he could stand for a total of three hours out of an eight hour work day; and that he could walk for a total of two hours out of an eight hour work day. (AR at 341.) Dr. Rubin indicated that plaintiff would need to change positions and take intermittent rest periods during the day. (*Id.*) Dr. Rubin reported that plaintiff could occasionally climb stairs and ramps; never climb ladders or scaffolds; and never balance, stoop, kneel, crouch, or crawl. (AR at 342.) Dr. Rubin found that plaintiff could never tolerate exposure to unprotected heights, moving mechanical parts, extreme heat or cold, or vibrations; and that he could occasionally tolerate operating a motor vehicle and humidity and wetness. (AR at 343.) With respect to daily activities, Dr. Rubin noted that plaintiff could shop; travel without a companion; walk without the assistance of a device; use public transportation; climb steps with the use of a single handrail; prepare simple meals; and care for his personal hygiene. (AR at 344.) Dr. Rubin concluded that plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces. (*Id.*)

C. Consultative Examiner

On July 22, 2013, after being referred by the SSA's Division of Disability Determination, plaintiff underwent an orthopedic consultative examination by Samir Dutta, M.D. (AR at 231-34.) Dr. Dutta's report states that plaintiff's "chief complaint" was that his "back and groin and hips hurt." (AR at 231.) The report further states that plaintiff explained to Dr. Dutta that "he was run over by a truck in 2008 when he sustained an injury to his hip. Both hips were pushed from the side impact and the MRI was done of the hip showing avascular necrosis of both hips." (*Id.*) Dr. Dutta noted that plaintiff had undergone a left hip replacement surgery, but "now complains of pain mostly on the right hip with early avascular necrosis stated by MRI and he is waiting for future replacement." (*Id.*) Dr. Dutta's report continues that plaintiff's "pain on the right [side] is sharp and gets aggravated with standing, walking, and doing activities"; "pain in the left hip is sharp also, steady, and radiates down to his left leg and knee area"; "pain over the lower back since 2012 is sharp and steady and stabbing type"; and "pain over the right knee is sharp and sometimes sporadic". (*Id.*) Dr. Dutta's report also notes that MRIs of plaintiff's back showed bulging and herniated discs and that plaintiff's "condition is aggravated with prolonged sitting, standing, and walking." (*Id.*) The report further indicates that plaintiff was taking Percocet. (AR at 232.)

With respect to daily activities, Dr. Dutta's report indicates that plaintiff "avoids cooking, cleaning, and laundry because of pain. He does shopping. He showers and dresses himself. He watches TV, listens to the radio, and reads." (*Id.*)

Dr. Dutta examined plaintiff and found that plaintiff "appeared to be in no acute distress"; that he walked with a "[s]light limp on [the] left side"; that he had "difficulty walking on [his] heels and toes on left"; and that he could "squat halfway". (AR at 232.) Dr. Dutta further noted that plaintiff's station was normal; he did not use an assistive device; he did not need help changing for the examination or getting on and off the examination table; and he was able to rise from a chair without difficulty. (*Id.*)

8

In examining plaintiff's cervical spine, Dr. Dutta noted flexion at 30 degrees bilaterally; extension at 30 degrees; lateral flexion 30 degrees bilaterally; and rotation 50 degrees bilaterally. (*Id.*) Dr. Dutta also noted a "slight spasm" but "[n]o cervical or paracervical pain." (*Id.*) With respect to plaintiff's lumbar and thoracic spines, Dr. Dutta noted "spinal flexion 70 degrees; extension 20 degrees; lateral flexion 20 degrees bilaterally; and rotation 20 degrees bilaterally." (AR at 233.) Dr. Dutta further noted "slight tenderness," but no spasm, scoliosis, or kyphosis. (*Id.*) Dr. Dutta additionally noted that plaintiff's straight leg raise test was negative bilaterally. (*Id.*)

Dr. Dutta diagnosed a "[h]istory of bulging and herniated disc of lumbosacral spine, post motor vehicle accident, and trauma to both hips with avascular necrosis of left hip and underwent left hip replacement." (AR at 233.) Dr. Dutta further wrote that "[p]ost three arthroscopies done to the right knee for torn meniscus with osteoarthritis changes and small ganglion cyst on the left wrist on radial side, reducible, with soft tissue repair over extensor surface for left arm." (*Id.*) Finally, Dr. Dutta opined that plaintiff has a "[m]ild limitation for sitting" and a "[m]oderate limitation for walking, lifting, and carrying heavy weight on a continuous basis." (AR at 234.)

D. Relevant Testimonial Evidence

1. Plaintiff's Testimony

During an October 2014 hearing before the ALJ, plaintiff testified that the "biggest thing" that was "keeping [him] from working" was pain in his back and right hip. (AR at 39.) With respect to his back, plaintiff testified that "from the mid-back down it's really painful particularly if you break the back down the middle, on both sides of my lower back it feels like there's a knife in both sides of my back." (AR at 40.) He further testified that the pain radiated down through his leg. (*Id.*) Plaintiff testified that his lower back and right hip caused him pain "constantly," and he rated his pain "somewhere between seven and nine" depending on the day. (AR at 44-45.) Plaintiff testified that he took oxycodone, "a lot of Advil liquigel caps," "Advil PM sometimes at night, and sometimes Aleve." (AR at 42.) Plaintiff testified that he did not sleep well at night due to his pain, and accordingly napped for about an hour, five days a week. (*Id.*) He also testified that he used heating pads daily. (AR at 46.)

As for treatment, plaintiff testified that Dr. Rubin was his regular doctor. (AR at 40.) He further testified that he saw Dr. Rubin every five or six weeks (AR at 40-41), and that physical therapy was one of the things that made his back feel better (AR at 46). Plaintiff testified that Dr. Padgett was his hip surgeon, and that he saw Dr. Padgett "at different intervals . . . it depends . . . my next appointment is in January, so I think that was three months from the last time." (AR at 41.) Plaintiff testified that Dr. Padgett typically took x-rays of plaintiff's hips, checked how plaintiff's left hip was healing, and examined the right hip to "judge where we're at." (*Id.*)

Regarding daily activities, plaintiff testified that he drove short distances about twice a day (AR at 30), but that he could not drive long distances (AR at 40). Plaintiff testified that he could bathe himself, grocery shop, prepare simple meals, and use public transportation. (AR at 42-44.) Plaintiff testified that he used to run and go to the gym, but had ceased those activities due to his injuries. (AR at 44.) When asked by the ALJ whether he had been on vacation in the last two years, plaintiff responded that he had spent a weekend at Foxwoods Resort and Casino and spent a week at a rental

9

house in Maryland. (AR at 31.) Plaintiff testified that he could sit for forty-five minutes at a time; stand for "maybe" fifteen minutes; and walk for fifteen minutes. (AR at 46.) Plaintiff stated that he used a cane to walk if he was having a particularly bad day, but, for the most part, he did not use a cane. (AR at 40.) When asked by the ALJ whether he thought he could lift twenty-five pounds using both arms, plaintiff responded that he believed he could. (AR at 46-47.)

2. The Vocational Expert's Testimony

Vocational Expert Dale Pasculli ("VE Pasculli") also testified at the October 2014 hearing. (AR at 47-51.) VE Pasculli testified that plaintiff had worked as a police officer, which carries a specific vocational preparation ("SVP") rating of six. (AR at 48-49.) The ALJ asked VE Pasculli to consider a hypothetical individual of the same age, education, and background as plaintiff, who is: capable of sedentary exertional work; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to wetness or humidity, hazards such as dangerous moving machinery, and unprotected heights. (AR at 49-50.) The ALJ continued that the hypothetical person is limited to occupations that can be performed while occasionally using a cane, if necessary, and that he should also be afforded the opportunity for a brief one to two minute change of position every half hour. (AR at 50.) The ALJ then asked VE Pasculli whether that hypothetical individual could perform plaintiff's past work. (*Id.*) VE Pasculli responded that the hypothetical individual could not perform plaintiff's past work. (*Id.*)

The ALJ then asked whether there were other occupations that the hypothetical individual could perform. (*Id.*) VE Pasculli responded that the hypothetical individual could perform work as a telephone solicitor, which carries an SVP rating of 3 and a sedentary exertional level (approximately 250,000 jobs in the national economy); as an information clerk, which carries an SVP rating of 4 and a sedentary exertional level (approximately 575,000 jobs in the national economy); or as an addresser, which carries an SVP rating of 2 and a sedentary exertional level (approximately 13,000 jobs in the national economy). (*Id.*)

When asked by the ALJ what the "tolerances for off task and absenteeism" is for these jobs, VE Pasculli responded that "a person would need to be on task at least 90 percent of the workday, and in terms of absences only one absence per month would be allowable." (*Id.*) VE Pasculli clarified that the 90 percent was exclusive of breaks and lunch. (*Id.*) VE Pasculli testified that these jobs would accordingly not be available to someone who required an hour-long nap each day. (AR at 51.)

Counsel for plaintiff then asked VE Pasculli whether the same hypothetical individual could perform those jobs if he could sit for a total of three hours in an eight-hour day and stand for a total of three hours in an eight-hour day. (*Id.*) VE Pasculli responded that the individual would not be able to do any of the three jobs she had described. (*Id.*) The ALJ then asked whether there would be *any* jobs that the individual could do, and VE Pasculli responded that there would not. (*Id.*)

II. PROCEDURAL BACKGROUND

A. Administrative History

Plaintiff filed an application for disability insurance benefits under Title II of the SSA on May 28, 2013, alleging disability as of June 19, 2012. (AR at 151, 161-62.) Plaintiff's application for disability insurance benefits was denied on August 13, 2012. (AR at 65-68.) On August 21, 2013,

10

plaintiff requested an administrative hearing, (AR at 69), which was held on October 30, 2014 (AR at 24-52). The ALJ denied plaintiff's claim on January 9, 2015. (AR at 9-23.) On March 10, 2015, plaintiff requested a review of the ALJ's decision by the Appeals Council (AR at 7-8), which was denied on August 10, 2016 (AR at 1-6). Accordingly, the ALJ's determination became the final decision of the Commissioner.

B. The Instant Case

Plaintiff commenced this lawsuit on October 7, 2016. (ECF No. 1.) On April 7, 2017, plaintiff moved for judgment on the pleadings. (ECF No. 10.) The Commissioner submitted a cross-motion for judgment on the pleadings on October 3, 2017. (ECF No. 14.) On October 31, 2017, plaintiff submitted his reply in further support of his motion for judgment on the pleadings and in opposition to the Commissioner's cross-motion for judgment on the pleadings. (ECF No. 15.) On November 21, 2017, the Commissioner submitted her reply in further support of her cross-motion for judgment on the pleadings. (ECF No. 17.) The Court has fully considered the parties' submissions.

III. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

IV. DISCUSSION

A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 1382c(a)(3)(B).

The Social Security Regulations establish a five-step procedure for determining whether a claimant is entitled to social security benefits. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

11

The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual function capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id*.

In making these determinations, the Commissioner "must consider four factors: '(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; (4) the claimant's educational background, age, and work experience.'" *Id*. (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. The ALJ's Ruling

At the first step in the five-step process, the ALJ determined that plaintiff had not engaged in substantial gainful activity since June 19, 2012, the alleged onset date of disability. (AR at 14.) The ALJ concluded that, although plaintiff had attempted to return to work in a lighter duty position in September 2014, "that work attempt was an unsuccessful work attempt." (*Id.*)

At the second step, the ALJ determined that plaintiff suffered from "severe impairments," including: degenerative disc disease of the lumbar spine, status post left total hip replacement, necrosis of the right hip, and status post right knee surgery. (*Id.*) The ALJ explained that these impairments are severe because "they impose more than a minimal limitation on the claimant's ability to perform work-related activities." (*Id.*)

At step three, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (AR at 15.)

At the fourth step, the ALJ found that plaintiff had the RFC to perform sedentary work as defined in 20 CFR § 404.1567(a), with the following limitations: plaintiff can never climb ropes, ladders, or scaffolds; can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and must avoid concentrated exposure to wetness or humidity and hazards such as dangerous moving machinery and unprotected heights. (*Id.*) Additionally, the ALJ found that plaintiff is "limited to occupations that permit the occasional use of a cane, when needed, and those that afford the opportunity for a brief 1-2 minute change of position every half hour." (*Id.*)

In considering plaintiff's symptoms, the ALJ followed a two-step process, in which an ALJ first determines whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's pain. (*Id.*) Second, if such an underlying physical or mental impairment has been shown, the ALJ is required to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limit plaintiff's functioning. (*Id.*) If statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on the ALJ's consideration of the entire case record. (*Id.*)

At the first step, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (*Id.*) At the second step, the ALJ concluded that plaintiff's "statements concerning the intensity, persistence, and limiting effects of th[o]se symptoms [were] not entirely credible." (*Id.*) The ALJ concluded that:

> [T]he record shows that plaintiff can do most routine activities of daily living. He can use a computer and use public transportation. He recently took a vacation where he rented a house in Maryland with his wife and friends. Furthermore, the medical evidence discussed below shows the claimant's main problem was his left hip. This was successfully treated with a total hip replacement and since that time, he has been doing well per his testimony. The medical evidence does not support the claimant's allegations as to the severity of his right hip and back disorders.

(AR at 16.)

To support these conclusions, the ALJ summarized diagnoses and findings from Dr. Rubin, Dr. Padgett, Dr. Silverman, and Dr. Dutta. (AR at 16-17.) First, the ALJ briefly described Dr. Rubin's history treating plaintiff, and his functional assessment of plaintiff in which Dr. Rubin opined that plaintiff could sit or stand for less than an hour at a time without interruption; could sit for a total of three hours in an eight hour workday; and could stand for a total of three hours in an eight hour workday. (AR at 16.) The ALJ gave "some weight" to Dr. Rubin's opinions because they were "based on a long treatment history," but "d[id] not give [them] great weight as the limitations attributed to the claimant's low back and right hip disorders [we]re not consistent with the objective diagnostic evidence or the reports of other treating and examining doctors or his own progress notes." (*Id.*) The ALJ continued that "the record does not establish that claimant has a limitation in his ability to sit other than needing to change position on occasion" and plaintiff's "activities of daily living and physical examination show that he can climb stairs and ramps, balance, stoop, kneel, crouch and crawl, and as he testified, he has no problem reaching." (*Id.*)

As for Dr. Padgett, the ALJ noted that Dr. Padgett reported on December 4, 2012 that plaintiff "ha[d] no symptoms on the right hip" and that plaintiff's "cervical spine, upper extremities and lumbar spine were largely unremarkable." (AR at 17.) The ALJ also noted Dr. Padgett's observation after plaintiff's left hip surgery that plaintiff was "doing well"; that "his left hip is good"; and that plaintiff was "extremely functional." (*Id.*) The ALJ gave "great weight" to Dr. Padgett's opinion as it "[wa]s based on personal treatment of the claimant

13

and [wa]s consistent with the clinical and objective diagnostic evidence." (*Id.*)

The ALJ discussed Dr. Dutta's consultative examination as well. (*Id.*) After summarizing Dr. Dutta's findings, including that plaintiff has a "mild limitation for sitting, [and a] moderate limitation for walking, lifting and carrying heavy weight on a continuous basis," the ALJ stated that she gave "great weight to the opinion of Dr. Dutta as it is based on a thorough physical examination of the claimant and is consistent with the record." (*Id.*)

The ALJ also briefly discussed plaintiff's December 12, 2012 visit to Dr. Silverman. (AR at 17.) The ALJ noted that Dr. Silverman found crepitus in plaintiff's right knee, but no ecchymosis or bruising and that Dr. Silverman's report indicated that plaintiff could perform a straight leg raise. (*Id.*) Lastly, the ALJ acknowledged that Dr. Silverman assessed plaintiff as having a 30 percent loss of use of the right leg. (*Id.*) The ALJ did not indicate how much weight, if any, she gave to Dr. Silverman's opinions.

In concluding, the ALJ found that plaintiff "had significant left hip pain that was successfully treated and resolved within less than twelve months of [plaintiff's] alleged onset date. [Plaintiff's] other orthopedic disorders while somewhat symptomatic do cause limitations that preclude certain work but not all work." (*Id.*) The ALJ stated that plaintiff's "low back, right knee and hip impairments are given credence in the undersigned's finding that he can only stand and walk two hours in an eight hour work day and needs to occasionally use a cane and change position, and can lift and carry ten pounds occasionally," but concluded that "the medical evidence and [plaintiff's] activities of daily living establish that the claimant retains the residual functional capacity for sedentary work." (AR at 17-18.)

After finding that plaintiff could perform sedentary work with the above-described limitations, the ALJ determined that plaintiff was unable to perform his past relevant work because his job as a police officer was "heavy-skilled work as the claimant performed it and medium skilled work as generally performed." (AR at 18.)

Moving to the final step of the five-step process, the ALJ determined that, considering plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (*Id.*) In determining whether a successful adjustment to other work could be made, the ALJ considered plaintiff's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. (*Id.*) The ALJ explained that, if plaintiff had the residual functional capacity to perform the full range of sedentary work, the Medical-Vocational Guidelines would direct a finding of "not disabled." (*Id.*) The ALJ had found, however, that plaintiff's ability to perform all or substantially all of the requirements of sedentary work was impeded by additional limitations. (*Id.*) To determine the extent to which plaintiff's aforementioned limitations eroded the unskilled sedentary occupational base, the ALJ had asked the vocational expert whether jobs existed in the national economy for an individual with plaintiff's age, education, work experience, and residual functional capacity. (AR at 18-19.) After noting VE Pasculli's testimony that, given all of these factors, the individual could perform work as a telephone solicitor, which carries an SVP rating of 3 and a sedentary exertional level (approximately 250,000 jobs in the national economy); as an

14

information clerk, which carries an SVP rating of 4 and a sedentary exertional level (approximately 575,000 jobs in the national economy); or as an addresser, which carries an SVP rating of 2 and sedentary exertional level (approximately 13,000 jobs in the national economy), the ALJ concluded plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (AR at 19.) Consequently, the ALJ determined that plaintiff did not qualify for disability benefits.

C. Analysis

Plaintiff challenges the Commissioner's decision that he is not disabled on several grounds. Specifically, plaintiff asserts that: (1) the ALJ failed to comply with the treating physician rule by declining to give controlling weight to Dr. Rubin's opinions; (2) the ALJ's RFC assessment was not supported by substantial evidence; and (3) the ALJ improperly evaluated plaintiff's credibility. As set forth below, the Court concludes that the ALJ did not adequately support her decision to give only "some weight" to Dr. Rubin's opinions and, thus, failed to satisfy the treating physician rule. Accordingly, the Court remands this case to the ALJ for further proceedings.

The treating physician rule "mandates that the medical opinion of the claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).[3]

If an ALJ does not give controlling weight to a treating physician's opinions, "the regulations require the ALJ to consider several factors in determining how much weight [the opinions] should receive." *Burgess*, 537 F.3d at 129. The ALJ must consider, among other things:

> '[T]he length of the treatment relationship and the frequency of the examination'; the 'nature and extent of the treatment relationship'; the 'relevant evidence . . . , particularly medical signs and laboratory findings,' supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues.

*Id.* (quoting 20 C.F.R. § 404.1527(d)). Additionally, the longer a treating source has treated a claimant and the more times a claimant has been seen by a treating source, the more weight will be given to the source's medical opinion. *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)). An ALJ's decision must make clear that he or she "considered the factors articulated in the Social Security Regulations for determining

---

[3] The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairments(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

what weight to assign to a treating physician's opinion." *Vlado v. Berryhill*, No. 16-CV-794 (MKB), 2017 WL 1194348, at *9 (E.D.N.Y. Mar. 29, 2017).

After considering these factors, the ALJ must "comprehensively set forth reasons for the weight given to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see also Clark*, 143 F.3d at 118 (requiring ALJs to provide good reasons in their determinations for the weight given to a treating physician's opinion); *Perez v. Astrue*, No. 07-cv-958 (DLI), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."). A "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see also Halloran*, 362 F.3d at 33 ("[W]e will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

Here, the Court concludes that the ALJ's analysis is insufficient to satisfy the above requirements, and that remand is therefore warranted. First, remand is warranted because the ALJ failed to consider each of the factors established by SSA regulations for determining the weight to give a treating physician's opinions. *See* 20 C.F.R. § 404.1527(d)(2). In particular, the ALJ's decision does not consider the frequency of Dr. Rubin's examinations; the length, nature, and extent of the treatment relationship; the evidence in support of Dr. Rubin's opinions; or Dr. Rubin's medical specialization. For example, the ALJ did not consider that, at the time of her decision, Dr. Rubin had been treating plaintiff for over two and a half years and had personally examined plaintiff over twenty times, or that plaintiff had received physical therapy under Dr. Rubin's supervision over 100 times. Nor did the ALJ analyze the evidence supporting Dr. Rubin's opinions—for example, that MRIs of plaintiff's lumbar spine showed bulging and herniated discs; that Dr. Rubin's notes over more than two years reflect ongoing muscle spasms and limited range of motion; or that plaintiff's pain was sufficiently severe that he was prescribed Percocet and oxycodone. [4] Finally, the ALJ failed to indicate how the fact that Dr. Rubin is a physiatrist influenced the weight given to Dr. Rubin's opinions. These omissions warrant remand. *E.g.*, *Ramos v. Comm'r of Soc. Sec.*, No. 13-CV-3421 (KBF), 2015 WL 7288658, at *7 (S.D.N.Y. Nov. 16, 2015) (remanding where "[n]owhere did the ALJ consider the length, nature, and extent of plaintiff and [physician's] treatment relationship, or the evidence [the physician] identified as supporting his opinion, or whether [the

---

[4] The Court notes that the ALJ's decision restates various portions of plaintiff's medical and treatment history, including some evidence that supports Dr. Rubin's opinions. However, simply noting such evidence, without acknowledging that the evidence supports Dr. Rubin's opinions and explaining why the evidence does not warrant giving controlling weight to those opinions, is insufficient to satisfy the treating physician rule. *See, e.g.*, *Arias v. Astrue*, No. 11 Civ. 1614, 2012 WL 6705873, at *2 (S.D.N.Y. Dec. 21, 2012) ("When the record contains testimony tending to contradict the ALJ's conclusion, the ALJ must acknowledge the contradiction and explain why the conflicting testimony is being disregarded."); *see also Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 431 (S.D.N.Y. 2010) (remanding where ALJ "cited selected portions of plaintiff's treating sources' opinions and did not meaningfully assess those reports as a whole [because] [i]n doing so, the ALJ failed to comply with a number of requirements embodied in the treating-physician rule").

physician] was a specialist"); *Moss v. Colvin*, No. 1:13-CV-731-GHW-MHD, 2014 WL 4631884, at *28 (S.D.N.Y. Sept. 16, 2014) (remanding where ALJ "did not address the fact that [treating physician was] a physiatrist and pain specialist, which should have affected his determination of the degree of deference to afford the doctor's assessment of plaintiff's symptoms of chronic pain"); *Clark v. Astrue*, No. 08 CIV. 10389 (LBS), 2010 WL 3036489, at *4 (S.D.N.Y. Aug. 4, 2010) ("[T]he ALJ did not consider 'the frequency of examination and the length, nature, and extent of the treatment relationship,' or whether the opinion was from 'a specialist.' 20 C.F.R. § 404.1527(d)(2). This legal error constitutes grounds for remand.").

Second, remand is warranted because the ALJ's stated reasons for giving only "some weight" to Dr. Rubin's opinions are inadequate under the treating physician rule. The ALJ addressed Dr. Rubin's opinions, and the weight given to those opinions, in only a few sentences. Specifically, to support her decision to give only "some weight" to Dr. Rubin's opinions, the ALJ stated that the limitations Dr. Rubin attributed to plaintiff's low back and right hip were "not consistent with the objective diagnostic evidence or the reports of other treating and examining doctors or his own progress notes"; that the "record does not establish" that plaintiff is limited in his ability to sit, "other than needing to change position on occasion"; and that plaintiff's "activities of daily living and physical examination show that he can climb stairs and ramps, balance, stoop, kneel, crouch and crawl, and as he testified, he has no problem reaching". (AR at 16.) These reasons for discounting Dr. Rubin's opinions are inadequate under the treating physician rule.

The ALJ's conclusory assertions that Dr. Rubin's opinions are "not consistent with the objective diagnostic evidence" or "the reports of other treating and examining doctors or his own progress notes"—without more—are insufficient to satisfy the requirement that the ALJ consider a treating physician's opinion's consistency with the record as a whole. *See, e.g.*, *Rugless v. Comm'r of Soc. Sec.*, 548 F. App'x 698, 700 (2d Cir. 2013) (remanding where "[t]he ALJ gave only a conclusory explanation of why [the treating physician's] opinion regarding appellant's ability to lift 10 lbs. is inconsistent with the record"); *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 267 (S.D.N.Y. 2016) (remanding where ALJ "did not explain what was contradictory between" opinions); *Agins-McClaren v. Colvin*, No. 14-CV-8648 (AJP), 2015 WL 7460020, at *8 (S.D.N.Y. Nov. 24, 2015) ("Conclusory statements such as the treating physician's opinion being . . . 'not consistent with the evidence on record' are insufficient reasons for assigning less weight to the opinion of treating physicians.").

The ALJ's second stated reason for giving less weight to Dr. Rubin's opinions was that "[t]he record does not establish the claimant has a limitation in his ability to sit other than needing to change position on occasion." (AR at 16.) As explained above, Dr. Rubin and Dr. Dutta were the only physicians to opine on plaintiff's ability to sit. Dr. Rubin opined that plaintiff could sit for less than an hour at a time and for no more than three hours in an eight hour workday. (AR at 341.) Dr. Dutta opined that plaintiff had a "[m]ild limitation" for sitting. (AR at 234.) It thus appears that the ALJ found that Dr. Dutta's opinion justified giving less weight to Dr. Rubin's opinion on plaintiff's limitations for sitting. However, "[a] consultative examiner's report which concludes that a plaintiff's condition is 'mild' or 'moderate,' without additional information, does not allow an ALJ to infer that a plaintiff is capable of performing the

17

exertional requirements of work." *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (superseded by statute on other grounds); *see also Garretto v. Colvin*, 15 Civ. 8734 (HBP), 2017 WL 1131906, at *21 (S.D.N.Y. Mar. 27, 2017) ("[The consulting physician's] use of the word 'moderate' is vague and provides no support for the ALJ's conclusion that plaintiff [can] engage in these activities for six hours out of an eight hour day."); *Young v. Comm'r of Soc. Sec.*, No. 7:13-CV-734, 2014 WL 3107960, at *9 (N.D.N.Y. July 8, 2014) (consulting physician opinion that claimant had "moderate" limitations in sitting not substantial evidence for finding that claimant could perform sedentary work). Thus, Dr. Dutta's opinion that plaintiff had a "[m]ild limitation for sitting" was not a sufficient ground for according less weight to Dr. Rubin's opinions. *See, e.g.*, *Burgess*, 537 F.3d at 128-29 (noting that medical expert opinion is not "sufficiently substantial to undermine the opinion of the treating physician," when the opinion vaguely describes an impairment with words like "mild" or "moderate"); *see also Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 487 (S.D.N.Y. 2018) (collecting cases concluding that consultative examiner opinions using adjectives like "mild" or "moderate" are not substantial evidence).[5]

Finally, plaintiff's daily activities were not a sufficient reason to give less weight to Dr. Rubin's opinions. The Second Circuit has emphasized that "a claimant need not be an invalid to be found disabled." *E.g.*, *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Indeed, "it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Giambrone v. Colvin*, No. 15-CV-05882 (PKC), 2017 WL 1194650, at *16 (E.D.N.Y. Apr. 3, 2017) (quoting *Nusraty v. Colvin*, 15-CV-2018, 2016 WL 5477588, at *12 (E.D.N.Y. Sept. 29, 2016)); *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 238-39 (E.D.N.Y. 2014) (quoting *Valet v. Astrue*, 10–CV–3282 KAM, 2012 WL 194970, at *19 (E.D.N.Y. Jan. 23, 2012)). Here, the evidence that plaintiff "can use a computer and use public transportation" and that he "recently took a vacation in Maryland with his wife and friends" was not a sufficient reason to discount Dr. Rubin's opinions. *See, e.g.*, *Doyle v. Apfel*, 105 F. Supp. 2d 115, 120 (E.D.N.Y. 2000) ("The activities of daily living that [the ALJ] relied upon, such as reading, watching TV, doing light household work, going out to dinner periodically, and taking occasional trips, are not indicative of an ability to satisfactorily perform a job.").

The ALJ's failure to consider each of the above statutory factors and to provide good reasons for discounting Dr. Rubin's opinions is particularly significant in light of her decisions to accord "great weight" to Dr. Padgett's and Dr. Dutta's opinions. Dr. Padgett was plaintiff's hip doctor: he performed plaintiff's left hip replacement and monitored the degeneration in plaintiff's right hip. Thus, Dr. Padgett's notes that plaintiff was "doing well" do not provide a good reason to give less weight to Dr. Rubin's opinions about plaintiff's lower back. Moreover, Dr. Padgett had seen plaintiff on only five occasions at the time of the ALJ's decision, two of which were for a consult and surgery on plaintiff's left hip

---

[5] To the extent the ALJ determined Dr. Rubin's medical findings were inadequate to support his opinions on plaintiff's limitations for sitting, it was the ALJ's "affirmative duty to develop the administrative record" and request additional information from Dr. Rubin. *See, e.g.*, *Monroe v. Astrue*, No. 12-CV-1456 WFK, 2014 WL 3756351, at *8 (E.D.N.Y. July 30, 2014) (quoting *Burgess*, 537 F.3d at 129); *see also Fontanez v. Colvin*, No. 16-CV-01300 (PKC), 2017 WL 4334127, at *23 (E.D.N.Y. Sept. 28, 2017).

(about which plaintiff does not currently complain). With respect to Dr. Dutta, the consultative examiner, the ALJ also accorded his opinions "great weight." Generally, however, a consultative examiner's opinion "should not be accorded the same weight as the opinion of a plaintiff's treating physician." *Giambrone*, 2017 WL 1194650, at *15. To the contrary, "in evaluating a claimant's disability, a consulting physician's opinions or report should be given little weight." *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)). "This is because 'consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" *Cabibi*, 50 F. Supp. 3d at 234 (quoting *Harris v. Astrue*, No. 07–CV4554(NGG), 2009 WL 2386039, at *14 (E.D.N.Y. July 31, 2009)); *see also Cruz*, 912 F.2d at 15. In short, the ALJ was required to give a significantly more detailed explanation as to why she gave "great weight" to Dr. Padgett's and Dr. Dutta's opinions while giving only "some weight" to Dr. Rubin's opinions. *See, e.g., Giambrone*, 2017 WL 1194650, at *18.

The Court additionally notes that the ALJ's decision not to credit Dr. Rubin's opinions was critical to the disability determination in this case. As explained above, plaintiff's counsel asked VE Pasculli whether jobs existed in the national economy for a hypothetical individual with the limitations that Dr. Rubin found plaintiff has. VE Pasculli responded that no such jobs existed. Thus, if Dr. Rubin's opinions were given controlling weight, plaintiff would be entitled to disability benefits.

Accordingly, because the ALJ's decision "does not reveal that the ALJ actually provided the required 'procedural advantages' or afforded the benefits of 'the substance of the treating physician rule,'" *Clark*, 2010 WL 3036489, at *4 (quoting *Halloran*, 362 F.3d at 32), and because plaintiff is "entitled to a comprehensive statement as to what weight is given and of good reasons for the ALJ's decision," *Burgess*, 537 F.3d at 132, remand is warranted under the particular circumstances of this case.[6]

V. CONCLUSION

For the reasons set forth above, plaintiff's motion for judgment on the pleadings is denied. The Commissioner's cross-motion for judgment on the pleadings is also denied. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

JOSEPH F. BIANCO
United States District Judge

Dated: May 10, 2018
Central Islip, New York

\* \* \*

Plaintiff is represented by John W. DeHaan of The DeHaan Law Firm P.C., 300 Rabro Drive East, Suite 101, Happauge, New York

---

[6] In light of this Court's conclusion that the ALJ failed to satisfy the treating physician rule, the Court need not address plaintiff's other arguments. However, after a proper application of the treating physician rule, the ALJ shall reassess the credibility determination of plaintiff, as well as the determination as to whether plaintiff had the RFC to perform sedentary work and whether there is other work in the national economy that plaintiff can perform.

11788. The Commissioner is represented by Assistant United States Attorney Layaliza K. Soloveichik of the United States Attorney's Office, Eastern District of New York, 271 Cadman Plaza East, 7th Floor, Brooklyn, New York 11201.